791 A.2d 1131 (2002)
348 N.J. Super. 347
In the Matter of the CIVIL COMMITMENT OF J.D.
Superior Court of New Jersey, Appellate Division.
Submitted February 14, 2002.
Decided March 7, 2002.
Peter A. Garcia, Acting Public Defender, attorney for appellant J.D., (Kim Curtis, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General of New Jersey, attorney for respondent State of New Jersey, (Nancy Kaplen, Assistant Attorney General, of counsel; Mary Beth Wood, Trenton, on the brief).
Before Judges KING, CUFF and WECKER.
The opinion of the court was delivered by *1132 KING, P.J.A.D.
The only issue on this appeal is whether the State established the requisite predicate act, an adjudication of a sexually violent assault necessary for a civil commitment under the Sexually Violent Predators Act (SVPA), specifically, N.J.S.A. 30:4-27.26. This section defines a sexually violent predator as
[a] person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

[Id. (emphasis added).]
Appellant contends that he was never properly adjudicated a delinquent for a predicate offense in the earlier proceedings against him. We agree, reverse and vacate the commitment of appellant under the SVPA. Appellant's purported guilty plea as a juvenile, age fifteen, to sexual assault was ineffective and did not constitute an adjudication of a predicate offense under the SVPA.

I
Appellant, J.D., was born on January 9, 1976. In 1989 J.D. was arrested for the sexual assault of a girl age six. The charge was amended to simple assault and J.D. was ordered to attend sex offender counseling.
In May of 1991 J.D.'s mother requested that he receive a psychological evaluation. Dr. John Belton diagnosed J.D. with pedophilia. Dr. Belton sent a report to the Division of Youth and Family Services (DYFS) in which he stated that J.D.'s progress was slow and he was in denial of his sexually acting-out behavior, despite three separate episodes since he began receiving therapy.
On July 24, 1991 J.D. sexually assaulted M.K., a girl age six, in the hallway of her apartment building. J.D. approached M.K. and told her to look out the window. As M.K. looked out the window, J.D. began to "hump" her from the rear. At this time a neighbor looked from her peep-hole, saw what J.D. was doing, and opened her door. She asked J.D. what he was doing but he did not respond and walked away.
J.D. was arrested on July 26, 1991. On August 10, 1991 his mother was told that a formal complaint was filed. She informed investigators that J.D. was receiving out-patient sex offender counseling. In January of 1992 Dr. Belton referred J.D to the Catholic Charities Family Growth's Sex Offender's Program in Hamilton Township. J.D. was evaluated by Catholic Charities' psychiatrist, Dr. Southwick, who diagnosed J.D. with an Adjustment Disorder with mixed disturbance of emotions and conduct, possible Impulse Control Disorder and temporal lobe epilepsy. Dr. Southwick determined that J.D.'s behavior was threatening to his family and neighborhood children. Dr. Southwick recommended that J.D. be placed in a residential treatment facility.
On March 9, 1992 J.D. received a second psychiatric evaluation, by Dr. Raymond Schweibert of the Youth Emergency Services (YES). Dr. Schweibert diagnosed J.D. with Conduct Disorder Solitary Aggressive Type, Oppositional Defiant Disorder and Pedophilia. On March 13, 1992 J.D. sexually assaulted S.M.J., a female age fourteen. J.D. approached S.M.J. in the hallway of Trenton Central High School and grabbed her buttocks. When S.M.J. hit J.D. on the arm, he knocked her down and began to bite at her nose.
*1133 On March 17, 1992 J.D. appeared without counsel before Judge Noden to enter a plea to delinquency complaint Docket No. FJ-11-769-92E, the "humping" of the girl age six on July 24, 1991 in the apartment hallway. The complaint alleged that on July 24, 1991 the appellant committed "an act of sexual assault ... in violation of N.J.S.A. 2C:14-2(b)" by "intentionally rubbing his groin area on the anal area" of the victim, age six, "with the intent to sexually gratify himself." During the hearing, this pertinent part of the dialogue occurred between Judge Noden and J.D.:

* * * * * *
THE COURT: We're here so you can enter a plea to one complaint that charges you with sexual assault involving a six-year old female back on July 24th, a Wednesday, at the middle of the day. Is that true or not true? THE WITNESS: Yes.
THE COURT: Do you want to explain briefly-for instance, who is I believe six-year old [M.K.] who is that person to you?
THE WITNESS: No, nobody.
THE COURT: What happened?
THE WITNESS: I was at work and
THE COURT: I'm sorry, what?
THE WITNESS: I was atI used to work at Trenton State Motor Pool on Calhoun Street and it was my last time.
THE COURT: What did you do there?
THE WITNESS: I pumped gas.
THE COURT: Okay. This was a summer job, you mean?
THE WITNESS: Yes.
THE COURT: Because this happened, I believe, in July. Go ahead.
THE WITNESS: Yeah. It was my last break and I had went out and I was playing for some kids and then I end upI end upI end up playing with this girl and then I ended up touching her, feeling all over her.
THE COURT: And her namethat's the [M.K.] She must have lived around [there], is that what you mean?
THE WITNESS: Yes.
THE COURT: And that was on Calhoun and you live where, on Edgemere, is that?
THE WITNESS: Yes.
THE COURT: Edgemere. The fire house is on the corner, is that THE WITNESS: Yes, sir.

* * * * * *
The remainder of the proceedings consisted of Judge Noden discussing J.D.'s treatment with his mother. The appellant's brief indicates this matter was on the "informal calendar" because no counsel appeared for him. Of considerable interest, is the final portion of the transcript where the judge went "off the record" and then stated on the record, "Yes. Yes. Because I haven't disposed of it. I'm not going to until I get, you know, further information and insight from these experts."
On March 18, 1992 J.D.'s mother brought him to the police station in response to a delinquency complaint, Docket No. FJ-11-2265-92E, charging assault and criminal sexual contact, the biting episode with the girl age fourteen.
On April 13, 1992 J.D. pled not guilty to the simple assault and criminal sexual contact charges of delinquency on the complaint with Docket No. FJ-11-2665-92E. At the conclusion of the proceeding, Docket Nos. FJ-11-2665-92E and FJ-11-769-92E were inactivated pending J.D.'s completion of the Pineland Program. On September 23, 1992 J.D. was transferred to KidsPeace National Centers for Kids in Crisis (KidsPeace) instead of the Pineland Program. KidsPeace records indicate that J.D. continued to engage in sexually inappropriate behavior with other residents *1134 and on a home visit. The psychological evaluation prepared at KidsPeace indicated that J.D.'s response to treatment was limited and he continued to present a very high risk of reoffense.
In March of 1996 J.D., now age nineteen, was released from KidsPeace. The Mercer County Prosecutor's office activated a bench warrant detainer for the two inactive delinquency complaints. On April 10, 1996 J.D. appeared before Judge Innes and voluntarily committed himself to the Trenton Psychiatric Hospital for a thirty-day psychiatric evaluation.
On July 29, 1996 J.D. was transferred to Ancora Psychiatric Hospital (Ancora). On July 31, 1996 Judge Forrester held a hearing to determine the disposition for the two inactivated delinquency complaints. The State moved for a dismissal of Docket No. FJ-11-2665-92E (the biting episode) and for sentencing on Docket No. FJ-11-769-92E (the girl, age six). Judge Forrester entered an order dismissing FJ-11-2665-92E and found that the dispositional aspect of FJ-11-769-92E had been satisfied by J.D.'s completion of the sex offender treatment program at KidsPeace. R. 5:24-3. J.D. was ordered to register as a sex offender pursuant to the Registration and Community Notification Law (Megan's Law). On December 13, 1996 J.D. was conditionally discharged from Ancora.
While conditionally discharged J.D. became involved with two girls, ages ten and twelve. J.D. wrote explicit letters to the girls requesting sexual activity. The mother of one of the girls found the letters and reported the matter. J.D.'s conditional discharge was revoked and he was returned to Ancora on May 7, 1997.
On May 1, 1998 J.D. was arrested and charged with sexually assaulting a patient at Ancora; the matter was not prosecuted due to insufficient evidence. On September 2, 1998 J.D. was arrested and charged with the assault of another patient at Ancora. The Community Dispute Resolution Committee heard the matter but the final disposition is unknown. On September 20, 1999 J.D. and another patient were accused of raping two female patients. The case was closed due to conflicting information.
On September 29, 2000 the State filed a petition seeking the temporary commitment of J.D. pursuant to the SVPA, N.J.S.A. 30:4-27.24 to -27.38. On October 10, 2000 Judge Thompson signed an order authorizing J.D.'s transfer to the Special Treatment Unit (STU).
On January 29, 2001 Judge Perretti held a commitment hearing at which J.D. moved to dismiss the petition for civil commitment and the temporary commitment order on the grounds that the State failed to prove by clear and convincing evidence that he had been adjudicated delinquent of a sexually violent offense as required by N.J.S.A. 30:4-27.32. The State argued that J.D. was adjudicated delinquent by Judge Noden on March 17, 1992. On January 31, 2001 Judge Perretti disagreed and entered an order dismissing the petition. On February 1, 2001 an application seeking J.D.'s temporary civil commitment pursuant to N.J.S.A. 30:4-27.1 was filed. On February 6, 2001 J.D. was temporarily committed to the Anne Klein Forensic Center.
On February 23, 2001 the State filed a motion seeking reconsideration of the January 31, 2001 order. On March 6, 2001 the Public Defender filed a cross-motion on J.D.'s behalf seeking to dismiss the State's petition with prejudice. On March 12, 2001 Judge Perretti denied the State's motion for reconsideration.
On March 14, 2001 the State filed an emergency appeal of Judge Perretti's January 31 and March 12, 2001 orders. On March 28, 2001 we granted the State's emergency application and reversed the January 31 and March 12, 2001 orders. *1135 We remanded for a plenary commitment hearing under the SVPA stating that the question of whether the "predicate offense" adjudication requirement was met must be determined at a "final hearing" because the documentary record was unclear to us at that point.
On March 28, 2001 J.D. filed an emergency application seeking a stay of our order remanding the matter for a final hearing. That application was denied. J.D. also filed an emergency application with the Supreme Court seeking a stay of this court's order pending a petition for certification. On April 2, 2001 the Court denied J.D.'s application.
On April 9, 2001 a final hearing was conducted before Judge Perretti pursuant to our March 28 order. During the hearing, the judge heard testimony from the State's experts, Dr. Timothy Foley, Ph.D., a forensic psychologist, Dr. Charles Gnassi, M.D., a psychiatrist at the STU, and J.D.'s mother.
On April 16, 2001 Judge Perretti held that the State had presented clear and convincing evidence that J.D. was a sexually violent predator in need of commitment. Judge Perretti stated that there was no dispute that the delinquency complaint Docket No. FJ-11-769-92E charged J.D. with sexual assault and that he had pled guilty to that offense before Judge Noden. She concluded that the juvenile court intended to dispose of this matter by confining J.D. at a residential treatment program. She ordered J.D. confined to the STU at Kearny for further care and treatment for one year and scheduled a review hearing for April 9, 2002.

II
Our current rule on juvenile guilty pleas states:
RULE 5:21A. JUVENILE PLEA FORM
A juvenile's plea of guilty is subject to the requirements of Rule 3:9-2. Before accepting a plea of guilty, the court may require a juvenile to complete, insofar as applicable, and sign the appropriate plea form prescribed by the Administrative Director of the Courts. The form shall then be filed with the Family Division Manager. The use of this form does not eliminate the obligation of the court to determine by inquiry of defendant and others, in the court's discretion, that a factual basis exists for the plea and that the plea is being made voluntarily, not as the result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea.
[Pressler, Current N.J. Court Rules, R. 5:21A (2002).]
While this Rule was not in effect at the time of J.D.'s purported guilty plea on March 17, 1992, Judge Pressler's comment tells us that
This rule was adopted effective September 1998 to provide for a juvenile's guilty plea to accord with the requirements of R. 3:9-2 and to provide for a plea form. The juvenile's execution of the plea form does not, however, relieve the court of the obligation to determine by inquiry of the juvenile that the prerequisites of R. 3:9-2 have been met.
Even before the adoption of this rule, a juvenile's guilty plea was held to be subject to the requirements of R. 3:9-2. State in the Interest of J.R., 244 N.J.Super. 630, 583 A.2d 376 (App.Div.1990). And see, e.g., State ex rel T.M., 166 N.J. 319, 325-27, 765 A.2d 735 (2001).

[Pressler, Current N.J. Court Rules, comment on R. 5:21A (2002).]
Appellant asserts that J.D.'s uncounselled statements before Judge Noden did not provide an adequate factual basis *1136 to support a guilty plea for sexual assault. "A factual basis for a plea `must obviously include defendant's admission of guilt of the crime or the acknowledgment of facts constituting the essential elements of the crime.'" State ex rel. T.M., 166 N.J. 319, 333, 765 A.2d 735 (2001) (quoting State v. Sainz, 107 N.J. 283, 293, 526 A.2d 1015 (1987)). In T.M., the defendant's counseled three-year-old guilty plea had triggered Megan's Law, N.J.S.A. 2C:7-1 to -11. On defendant's motion to vacate the plea, the Court addressed the question of whether the procedural safeguards had been observed when the factual basis for a juvenile sex offender's guilty plea consisted primarily of the prosecutor's factual proffer. Most pertinent to this matter was the Court's finding that under N.J.S.A. 2C:14-1d, "[a]n element of the offense of criminal sexual contact ... is that the offender commit the contact for the purpose of degrading the victim or for the offender's own personal sexual arousal or gratification. The factual basis for that element was entirely absent from the State's factual proffer." Id. at 333-34, 765 A.2d 735. The Court rejected the State's contention that "State v. Smullen, 118 N.J. 408, 571 A.2d 1305 (1990), supports the proposition that a court may consider evidence available to a prosecutor as satisfying the requirements of a crime through inference." Ibid. The Court stated "Smullen does not support the proposition that a prosecutor's unrebutted factual allegations suffice to establish the requisite factual basis for a plea. Nor does that decision suggest that a trial judge may infer a defendant's purposedegrading or humiliating the victim or sexually arousing or gratifying the victimizerfrom the act of sexual contact with a victim." Id. at 335, 765 A.2d 735. The Court also observed that the record failed to reflect that the juvenile offered his guilty plea voluntarily or with a full understanding of the consequences of such a plea. Ibid. "A plea is valid only when the court discloses all material terms and relevant consequences and makes certain that the defendant fully understands, and knowingly and voluntarily accepts, those consequences." Ibid. (citing State v. Jackson, 118 N.J. 484, 488, 572 A.2d 607 (1990)). The Court in T.M. ruled "that T.M effectively entered a guilty plea, but that the procedural safeguards that must attend such a plea were not observed," 166 N.J. at 337, 765 A.2d 735, and reminded us that
The specificity and rigor embodied in Rule 3:9-2 manifest a systemic awareness that a defendant waives significant constitutional rights when pleading guilty, which places an affirmative obligation on a court to reject a plea of guilty when that court is not independently satisfied that the Rule's prerequisites are met.

* * * * * * *
... The State has an interest in finality, and that interest is furthered when convictions are made less vulnerable to later appellate challenge through assurance of the procedural integrity of the initial proceedings. One need look no further than this case to find an example of procedural imprecision impinging on the interest of finality.

[State ex rel. T.M., 166 N.J. at 326, 337, 765 A.2d 735.]
The purported uncounselled guilty plea J.D. entered on March 17, 1992 raises the same concerns addressed by the Court in T.M. Not only did J.D.'s uncounselled plea fail to address the factual elements of the crime of sexual assault, there is no indication that either J.D. or his mother was ever advised or understood the potential consequences of entering such a plea.
A very questionable aspect of the March 17, 1992 hearing was J.D.'s lack of representation *1137 by counsel. N.J.S.A. 2A:4A-39 states:
a. A juvenile shall have the right, as provided by the Rules of Court, to be represented by counsel at every critical stage in the proceeding which, in the opinion of the court may result in the institutional commitment of the juvenile.
b. During every court proceeding in a delinquency case, the waiving of any right afforded to a juvenile shall be done in the following manner:
(1) A juvenile who is found to be competent may not waive any rights except in the presence of and after consultation with counsel, and unless a parent has first been afforded a reasonable opportunity to consult with the juvenile and the juvenile's counsel regarding this decision. The parent or guardian may not waive the rights of a competent juvenile.
(2) Any such waiver shall be executed in writing or recorded. Before the court may accept a waiver, the court shall question the juvenile and his counsel to determine if the juvenile is knowingly, willingly and voluntarily waiving his right. If the court finds after questioning the juvenile that the waiver is not being made voluntarily and intelligently, the waiver shall be denied.
See also R. 5:24-2(a); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
Obviously, the hearing on March 17, 1992 was intended to provide a means for J.D. to receive treatment. Equally apparent from the record before us is the fact that J.D. is presently still in need of treatment, supervision and confinement. We completely agree with Judge Perretti's determination that J.D. "suffers from an abnormal mental condition affecting his cognitive and volitional capacities in such a way as to predispose him to commit violent sexual offenses. And it is more likely than not that he will commit violent sexual offenses if not confined to this facility [STU] for care, treatment and control." We do not agree, however, with her determination that the statements made before Judge Noden constituted a valid plea of guilty and an effective adjudication of juvenile delinquency.
Nor can we agree with Judge Forrester, who inferred from the record on July 31, 1996, that J.D.'s placement at KidsPeace constituted a disposition after a finding of delinquency based on a guilty plea. R. 5:24-3. We can make no such inference on this record in the face of this uncounselled and inadequate guilty plea attempt.
Appellant J.D.'s challenge here to his commitment under the SVPA constitutes a collateral attack upon his adjudication of a sexual offense. Usually, post-conviction collateral attacks are brought pursuant to R. 3:22. This is the preferred means of collateral attack on an adjudication or conviction. Our decision today should not discourage first resort to R. 3:22's traditional means of relief from an earlier adjudication or conviction. We have addressed the adjudication in this context only because the defects are patent and not subject to debate.
Our vacation of this commitment order should not suggest that appellant is without need of some form of treatment in a secure environment. He certainly does need help. We hold only that he does not fit the predicate condition established by the Legislature for commitment under the SVPA. The State may wish to resort to alternative commitment procedures on this record, if it desires. See N.J.S.A. 30:4-27.1 to -27.23; R. 4:74-7.
Reversed.